UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CLUB PROPERTIES, INC.; JAMES W.
RODGERS AND BETTY RODGERS, husband
and wife, individually and as Trustees of Jim and
Betty Rodgers Joint Revocable Trust                                                        PLAINTIFFS


v.                                      CASE NO. 4:07-CV-00550 GTE


CITY OF SHERWOOD, ARKANSAS;
MAYOR BILL HARMON, in his official and
individual capacities; MAYOR VIRGINIA HILLMAN,
in her official capacity; BECKI VASSAR, CHARLIE
HARMON, LEX DAVIS, DAVID HENRY, SHEILA
SULCER, MARINA BROOKS, KEITH RANKIN
and DR. STEVE FENDER, in their official capacities
as members of the Sherwood City Council and in their
individual capacities; RON CAMPBELL and
ROY MARPLE; and FREDDIE HUDSON, WAYNE
SMITH, FORREST PENNY, RAY HARRISON, and
LUCIEN GILLHAM, in their official capacities as members
of the Sherwood Planning Commission                                                        DEFENDANTS

## ORDER

Presently before the Court are the Motion for Summary Judgment and the Motion in Limine filed by Separate Defendants Ron Campbell and Roy Marple.

**I.     BACKGROUND**

Club Properties, Inc. ("Club") is the owner of record of the North Hills Country Club (the "subject property") located in the City of Sherwood, Pulaski County, Arkansas. The homestead of James and Betty Rodgers ("the Rodgers"), which is owned by the Jim and Betty Rodgers Joint Revocable Trust (the "Trust"), is located on Lots 30 and 31 North Hills Club Addition and

includes an easement from such lots to Highway 107, all of which is located within the subject property.

Defendant Bill Harmon is the former elected Mayor of the City of Sherwood who retired briefly and was then appointed as Interim Mayor, and who was succeeded in office in July of 2007 by Defendant Virginia Hillman. Defendants Becki Vassar, Charlie Harmon, Lex Davis, David Henry, Sheila Sulcer, Marina Brooks, Keith Rankin and Dr. Steve Fender are the duly elected members of the Sherwood City Council. Defendants Freddie Hudson, Wayne Smith, Forrest Penny, Ray Harrison, and Lucien Gillham are duly appointed and acting members of the Sherwood Planning Commission. Defendants Ron Campbell and Roy Marple are the alleged buyers of the subject property.

The Complaint alleges, in part, the following:

In early 2007, the stockholders and directors of Club made the decision to close North Hills Country Club and to sell the subject property to any interested party. Plaintiff also alleges that on or about February 26, 2007, the stockholders and directors and their respective spouses, acting for an on behalf of Club, entered into a written Offer and Acceptance with Defendants Campbell and Marple for the sale of the subject property for $5,100,000.00 (the "contract"), which included the sale of the Rodgers' homestead and was conditioned upon the Buyers' ability to obtain financing. Plaintiffs further allege that Marple applied for a loan and obtained a written loan commitment for $4,500,000 from National Bank of Arkansas ("NBA"), and that on or about March 13, 2007, the Buyers removed, in writing, the financing condition from the real estate sales contract. Plaintiff states that on April 19, 2007, the real estate sales contract was amended to set a closing date of April 27, 2007, unless further extended.

In March or early April 2007, a public meeting was held at the Harmon Recreation Center at which NBA's president, Al Harkins, stated that NBA had agreed to loan the Buyers the money to fund their purchase of the subject property.  On or about March 23, 2007, Club received a notice of violation from the Arkansas Department of Environmental Quality ("ADEQ"), which served to delay the closing and increase the Buyers' expense because NBA required the Buyers to obtain an environmental assessment of the subject property.  Additionally, Defendant Campbell was informed by Mr. Hudson that he would never be able to develop the subject property as described.  Mr. Hudson is Chairman of the Planning Commission and owns commercial property adjacent to the portion of the subject property that Buyers proposed and Club has now applied to be rezoned commercial.

On April 16, 2007, Tim Grooms, at attorney assisting the City on this matter, and Steve Cobb, the Sherwood City Attorney, obtained a title insurance commitment on the subject property.  They met with the Buyers and learned that the Buyers intended to close on the real estate sales contact on April 27, 2007.  On April 17, 2007, Grooms delivered a copy of a Moratorium Resolution to the City Attorney.

The City held a regular city council meeting on April 23, 2007.  At that meeting, Resolution No. 10-2007 entitled "A Resolution to Declare a Moratorium for A Period of Six Months To Stop the Issuance Of Permits Or Acceptance of Rezoning Applications Or Plats For The Area Of North Hills Country Club And for Other Purposes" (the "Moratorium Resolution") was brought forward for a vote.  The Moratorium Resolution was adopted by unanimous vote. Following the City's adoption of the Moratorium Resolution, the Buyers failed and refused to close on the real estate sales contract by notifying Plaintiff on or about April 27, 2007 that

because they could not get the Moratorium Resolution lifted by the City, NBA refused to fund the Buyers' loan.

On or about October 24, 2007, the Moratorium Resolution expired in accordance with its terms and the Sherwood City Council did not officially act to extend or renew it. Subsequently, Club caused to be prepared a preliminary subdivision plat for the platting of a single family residential subdivision on a portion of the subject property, which is zoned for single family residences and caused it to be filed with the Sherwood Planning Department on November 20, 2007. On or about November 27, 2007, the Sherwood Planning Department delivered a letter to Club's engineer, Basil Shoptaw, which set forth a list of comments that would need to be addressed in order to proceed with the review process with the Planning Commission.

In response thereto, Shoptaw conferred with Mr. Clayton, the acting Sherwood City Engineer, and prepared a modified preliminary plat dated December 18, 2007. Although the December 18th plat was timely filed to be placed on the agenda for the January 8, 2008 meeting of the Sherwood Planning Commission, Clayton failed to provide Shoptaw with a comment letter. Club also caused to be prepared and timely filed an application to rezone approximately 14 acres of the subject property and provided notice of its application by certified mail with return receipts required. The Planning Department reviewed the application, the notices, and returned receipts, and placed the matter on the agenda for the January 8th meeting. However, at the meeting, the Planning Commission "tabled indefinitely" its consideration of the Club's rezoning application and the December 18th preliminary plat, and Planning Commission member Smith stated his intention to impose several conditions on approval of the plat.

On January 16, 2008, the Planning Commission called a special meeting to recharacterize its actions on Club's December 18th preliminary plat as being simply a deferral of that matter until the next regularly scheduled meeting of the Planning Commission on February 12, 2008. At the meeting, Clayton made representations to the Planning Commission about what he would provide to Shoptaw, but as of February 25, 2008, no comments letter has been delivered to Club or Shoptaw.

On January 24, 2008, Hillman and Sherwood City Council members met with Steve Cobb, the City Attorney, David Fuqua and other individuals who were not City officials to discuss this litigation, at which time it was decided that the institution of a formal condemnation action would enable the Planning Commission to avoid having to deal with Club's re-zoning application and the December 18th preliminary plat and would possibly moot some of the federal court claims.

On January 28, 2008, the Sherwood City Council adopted Ordinance # 1767 authorizing the condemnation of the subject property, including the Rodgers' homestead. The original condemnation complaint was filed on February 7, 2008. At its February 12, 2008 meeting, the Sherwood Planning Commission failed and refused to consider Club's rezoning application and the December 18th preliminary plat stating that same had been rendered moot by Ordinance # 1767 and the filing of the condemnation complaint.

## II.   UNDISPUTED FACTS

The following are the undisputed facts relating to this motion: Plaintiffs and Defendants Campbell and Marple entered into an Offer and Acceptance. The closing for the Offer and Acceptance was to have occurred on April 27, 2007, but did not occur. Defendant City of

5

Sherwood sought the aid of outside counsel Mr. Tim Grooms and his law firm of Quattlebaum, Grooms, Tull & Burrow ("QGTB") to advise the City of Sherwood with respect to the condemnation proceedings relating to the North Hills Country Club Property.

On February 27, 2007, Mr. Grooms received an e-mail, by City of Sherwood city attorney Steve Cobb, stating:

> We learned that Ron Campbell has agreed to purchase North Hills CC for 3.9 Million. His plan is high end residential. The City would like to consider eminent domain to maintain the course and green space. . . .

On March 5, 2007, National Bank of Arkansas issued a loan commitment to Defendant Marple to loan him and his wife $4.5 million dollars for the purchase of North Hills Country Club.

Pursuant to instructions from Mr. Grooms, Standard Abstract, as agent for Chicago Title Insurance Company, on April 16, 2007, submitted a title commitment to Mr. Grooms that reflected the owner of record of the North Hills Country Club as of April 9, 2007. On or about April 19, 2007, Mr. Ron Bragg, a licensed appraiser submitted a proposal to the City of Sherwood to appraise the market value of North Hills Country Club. The proposal was accepted and Mr. Bragg was hired by the City of Sherwood.

On April 23, 2007, the City of Sherwood passed Resolution #10-2007 commonly referred to as the moratorium. Mr. Al Harkins was the loan officer for National Bank of Arkansas and the person, at that bank, handling the loan. A letter dated May 12, 2007, from Mike Mathes, President of National Bank of Arkansas, to Mr. Roy Marple states, "Not all conditions of the above loan commitment were met. Therefore, the loan will not be funded."

The City of Sherwood has filed a condemnation complaint relating to the North Hills Country Club in Pulaski County Circuit Court.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

**IV.     MOTION FOR SUMMARY JUDGMENT**

Defendants Campbell and Marple move for summary judgment as to Count VI of Plaintiffs' Third Amended Complaint, which requests specific performance, and request that they be dismissed from the action. Count VI of the Third Amended Complaint requests that the Court grant Club "specific performance of the real estate sales contract, as amended, on which the Buyers defaulted" and require "the Buyers to fully perform under such contract by paying to the plaintiffs the sum of $5,100,000.00, plus interest from April 27, 2007 or the contractual costs for the delay in closing plus an award of their attorneys fees and costs incurred.

Defendants argue that the remedy of specific performance is not available to Plaintiffs because Plaintiffs' could not perform an essential condition of the contract–the conveyance to Defendant Buyers of a merchantable title–due to the moratorium. Defendants state that the contract provides:

> The Seller is to furnish a Seller's Policy of Title Insurance to said real estate in the name of the Grantors who will sign the deed conveying said real estate, free and clear of all liens and encumbrances except as stated herein and all restrictions of record if any.
> . . .
> At closing, Seller shall also deliver proper warranty deed; conveying merchantable title to said properties.

Defendants also state that the day after the contract date, February 27, 2007, Sherwood's city attorney e-mailed Mr. Tim Grooms regarding possible condemnation of the golf course. Within one week, on March 5, 2007, QGTB send a memorandum to Mr. Cobb regarding condemnation. Prior to the closing date, a consultant was hired to evaluate the golf course as a municipal facility, QGTB was retained to file condemnation proceedings, a real estate appraiser was hired to provide a market value for the golf course and a title search was conducted. Defendants set forth the language of the moratorium as confirmation of the City of Sherwood's intent.

Defendants further argue that Mr. Al Harkins stated in his deposition that the moratorium was a cloud on the title and the bank declined to fund the loan and withdrew its loan commitment. However, Plaintiffs note that Mr. Harkins is not an attorney or real estate title expert. They further note that, in his deposition testimony, Mr. Harkins relied upon paragraph 20 entitled "Changes in Financial Condition and Adverse Occurrences" as a basis for opting out of the loan commitment.

Plaintiffs argue that the adoption of the Moratorium Resolution by the City of Sherwood on April 23, 2007, did not result in the transfer of title, or any legal interest, from the Plaintiffs to the City and did not render title to the subject property unmarketable. Plaintiffs further argue that Guy Maris, the CEO of Standard Abstract & Title Company, Inc. as the agent for Chicago Title Insurance Company, which was the issuer of the commitment for the issuance of an owner's

policy of title insurance which the Plaintiffs had caused to be delivered to the Buyers, testified that he was ready, willing, able and had prepared to close on the sale of the subject property on or before April 27, 2007, notwithstanding the City's adoption of the Moratorium Resolution on April 23, 2007.[1]

Additionally, Plaintiffs argue that, as a matter of law, the filing of the state court condemnation complaint does not serve to transfer fee simple title to the subject property to the City since no compensation has been deposited by the City, no order of taking has been entered, and the City has an absolute right to discontinue its state court condemnation action against the subject property at any time prior to the actual payment of the awarded compensation even after the jury's verdict. *Vogel v. Crittenden County*, 308 Ark. 250, 252 (1992) ("[A] condemnor has an absolute right to discontinue a condemnation action until actual payment of the compensation."). Thus, the City still has not acquired an interest in the subject property.

Plaintiffs further argue that Defendants Campbell and Marple are equitable owners of the real property as the purchasers in an executory contract. *See Haynes v. Metcalf*, 297 Ark. 40, 42 (1988) ("[T]he purchasers in an executory contract become the equitable owners of the property purchased."). In *Brown v. Arkansas Central Railway Co.*, 72 Ark. 456 (1904), a railroad company constructed its railroad tract across land being purchased under an executory contract before the contract was paid off. Subsequently, a deed was delivered by the seller to the purchaser's widow. *Id*. The Arkansas Supreme Court held that the seller, the record title owner

---

[1] Defendants correctly argue that Mr. Maris' opinion is not admissible to prove whether the moratorium had an impact on the merchantability of title. However, Plaintiffs correctly note that Mr. Maris may testify as a fact witness and state that he, on behalf of Standard, was prepared to close the sales transaction and issue the committed owner's policy to the Buyers notwithstanding the City's adoption of the Moratorium Resolution.

at the time of the taking, was not a necessary party to the suit. *Id*. *See also Summers v. Midland Co.*, 167 Minn. 453, 209 N.W. 323 (1926) ("No person is presumed to covenant against the acts of sovereignty. The vendee takes the equitable title, subject to the exercise of the right of eminent domain, just as though the title had been conveyed to him."). Plaintiffs also cite *City of Chicago v. Robertson*, 48 Ill. App. 2d 241, 198 N.E.2d 192 (1964), in which the court stated that "[c]ondemnation does not relieve the purchaser of this obligation to pay the purchase price." Thus, Plaintiffs argue that since Defendants Campbell and Marple are the equitable owners of the real property that said Defendants are entitled to the condemnation proceeds, and thus, they were obligated to close under the contract irrespective of the Moratorium Resolution and the City's current state court condemnation action.

Defendants Campbell and Marple argue that these cases are distinguishable because they involve real property transactions in which the vendor has sold real estate to a vendee, the closing has taken place, the vendee takes possession, has begun making installment payments and a condemnation proceeding takes place after closing and possession. Defendants state that the city of Sherwood, through the actions of its various agents, began a process of condemning the golf course immediately after Plaintiffs and Defendants entered into the contract–a process which continues today in Pulaski County Circuit Court.

Defendants also argue that 21 A.L.R. 2d 792 states, in § 2, under the "contract doctrine," that the pendency of a proceeding for condemnation, prior to the conveyance of legal title, constitutes a defect or encumbrance which renders the title unmarketable. As such, the vendee is entitled to refuse to accept the conveyance. However, 21 A.L.R. 2d 792, § 2, actually states:

11

> Under this doctrine, according to one line of decisions, where the vendor is obligated to convey marketable title, the appropriation of the property or a portion thereof or an easement therin, under the power of eminent domain, prior to the conveyance of the legal title, or the pendency of a proceeding for such purpose, constitutes a defect or encumbrance which renders title unmarketable, entitling the vendee to refuse to accept conveyance and to rescind the contract and recover the amount paid on account of the purchase price. This rule has been applied where the condemnation proceeding was instituted prior to the execution of the contract. . . . It has also been applied, in some jurisdictions, where the proceeding was instituted after the execution of the contract.

Additionally, 21 A.L.R. 2d 792, § 7, states, "Obviously, the mere inchoate right to appropriate the property in question under the power of eminent domain, without any indication of an intention to exercise such right, or a likelihood that it will be exercised, does not constitute a defect in or encumbrance on the title to such property." The Court also notes that in *Lansburgh v. Market St. Ry. Co.*, 98 Cal. Ct. App. 2d 426, 429-31, 220 P.2d 423, 426-27 (1950), the court rejected the contention that the preliminary steps taken by the city which showed a contemplated future acquisition of part of the property in behalf of a street extension made the seller's title defective, or at least doubtful, and therefore not marketable. The court explained:

> It is the condition of the title at the time fixed for performance which determines the rights of the parties to the agreement to sell. 8 Thompson on Real Property, 535; *Craig v. White*, 157 Cal. 489, 202 P. 648; 55 Am.Jur. 717. When it is said that reasonable doubt or probable litigation are sufficient to make a title not marketable that expression refers to dubious defects, encumbrances, outstanding claims or color of title in others, which if upheld would prove the title defective at the time of performance.
> . . .
> In the present case to the contrary it cannot be said that at the time for performance, as which we may consider the first three months of 1948, there was any claim of right of the city and county, dubious or not, outstanding in connection with the contemplated future condemnation of part of the property. Neither the presence of the provisional map in the office of the Department of Public Works, nor the authorization of the incurring of a bonded debt for the Gough Street extension project brought any change in the legal relations of the city and county and the owner with respect to the property. The city and county

> had still in the property in question no more than the same inchoate right of eminent domain which it had in all other property within its boundaries, a right which clearly is not an encumbrance or defect of title.
>
> . . .
>
> It is true that as a matter of fact long before the actual institution of condemnation proceedings relating to part of a property the possibility of such action shown by preliminary steps or plans or even discussion or rumors may influence the value of the property and its fitness for some intended use advantageously or disadvantageously. It is conceivable that under certain circumstances the influence may be such as to justify rescission by the purchaser, for instance on the theory of frustration, material failure of consideration, mistake or fraud. But in this case no factual basis for any of these theories is alleged or proved. Appellant's theory is that the reasonable probability of condemnation in the indefinite future is a cloud upon the title which if not expressly exempted makes the title bad and permits the purchaser to affirm or rescind the contract at his election independent of the purchaser's knowledge or lack of knowledge of that probability at the time of the contract, independent of the purpose for which he wished to acquire the property, independent of any detrimental effect of the probability or the later effectuation of the taking on the intended use or on the value of the property. Appellant has not cited any authority for this theory in a situation where, as in this case, the measures taken prior to the time for performance had no restricting legal effect whatever on the owner's rights. We have found none and see no reason to initiate a rule which seems unnecessarily inflexible and prejudicial to the owner, whose title would be branded unmarketable during the period, possibly extending over years, from the time that condemnation in the future becomes reasonably probable or certain until the actual institution of proceedings, a detriment which he can in no way remove and for which he cannot obtain compensation. We conclude that the seller's title was not defective as a matter of law.

*Id.* at 430-32, 220 P.2d at 427-28.

"Defective title is defined as 'a title that cannot legally convey the property to which it applies, usually because of a conflicting claim.'" *First United, Inc. v. Chicago Title Ins. Co.*, 366 Ark. 508, 511 (2006) (citing Black's Law Dictionary 1492 (7th ed. 1999)). In *Black's Law Dictionary* (8th ed. 2004), "merchantable title" refers to "marketable title", which is defined as "[a] title that a reasonable buyer would accept because it appears to lack any defect and to cover the entire property that the seller has purported to sell; a title that enables the purchaser to hold

property in peace during the period of ownership and to have it accepted by a later purchaser who employs the same standards of acceptability."

In *Griffith v. Maxfield*, 63 Ark. 548, 39 S.W. 852 (1897), the Arkansas Supreme Court, quoting *Vought v. Williams*, 120 N.Y. 253, 24 N.E. 195 (1890), stated:

> A marketable title is one that is free from reasonable doubt. There is some reasonable doubt when there is uncertainty as to some defects appearing in the course of its deduction, and the doubt be such as affects the value of the land, or will interfere with its sale. A purchaser is not to be compelled to take property the possession of which he may be compelled to defend by litigation. He should have a title that will enable him to hold his land in peace, and if he wishes to sell it, be reasonably sure that no flaw or doubt will arise to disturb its market value.

"[M]arketability of title relate[s] to 'defects affecting legally recognized rights and incidents of ownership' and [is] distinct from the lack of economic marketability of the land itself." *First United*, 366 Ark. at 512.

> Specific performance is an equitable remedy which compels the performance of a contract on the precise terms agreed upon or such a substantial performance as will do justice between the parties under the circumstances. It is a means of compelling a contracting party to do precisely what he should have done without being coerced by a court. 81 C.J.S. Specific Performance § 2, 701; 71 Am. Jur. 2d 10, Specific Performance, § 1; Restatement of the Law, Contracts § 358, Comment a, § 359(2), § 360(b), § 326(c). The object in such cases is to place the party without fault in as nearly the same position as he would have been had there been no default by the other party. *Pillsbury v. J.B. Streeter, Jr. Co.*, 15 N.D. 174, 107 N.W. 40 (1906).

*McCoy Farms, Inc. V. J & M McKee*, 263 Ark. 20, 32 (1978). "A party seeking specific performance of a contract must show that he has at all times been ready, able, and willing to perform his part of the contract, and that he has complied with the terms of the contract by performing, or offering to perform, the acts which form consideration of undertaking on the part of the other party." *Vaughn v. Morris*, 12 Ark. App. 106, 108, 671 S.W.2d 195, 197 (1984).

Defendants rely upon Plaintiff's inability to furnish a Seller's Policy of Title Insurance "free and clear of all liens and encumbrances except as stated herein and all restrictions of record if any," and convey "merchantable title" as evidence that Plaintiffs were not ready, able, and willing to perform on the contract.  In this case, at the time that Plaintiffs and Defendants Campbell and Marple entered into the contract, the City of Sherwood had taken no action to condemn the subject property.  The Court notes that the critical date here is April 27, 2007, the date upon which closing was to occur.  Although it appears that at that time the City of Sherwood was contemplating condemnation and had passed the Moratorium Resolution, the condemnation complaint had not been filed.  Furthermore, Plaintiffs have presented evidence that they were ready, willing, and able to produce a Policy of Title Insurance.  At the time for performance, the City of Sherwood had "no more than the same inchoate right of eminent domain which it had in all other property within its boundaries, a right which clearly is not an encumbrance or defect of title."  Although preliminary steps may have influenced the value of the property and its fitness for some intended use, such steps did not, as a matter of law, cause title to be unmerchantable.  Therefore, the Court cannot say that no reasonable jury could find that Plaintiffs are entitled to specific performance of the contract.  Summary judgment is denied.

**V.     MOTION IN LIMINE**

Although Defendants do not separately set forth their Motion in Limine, as noted above, it appears that Defendants seek to exclude Mr. Maris' opinion regarding whether the moratorium had an impact on the merchantability of title.  For purposes of summary judgment, it appears that Plaintiffs only seek to present Mr. Maris' factual testimony that he, on behalf of Standard, was prepared to close the sales transaction and issue the committed owner's policy to the Buyers

notwithstanding the City's adoption of the Moratorium Resolution. Therefore, Defendants' motion is denied as moot.

Accordingly,

IT IS THEREFORE ORDERED THAT the Motion for Summary Judgment filed by Defendants Campbell and Marple (Docket No. 81) be, and it is hereby, DENIED.

IT IS FURTHER ORDERED THAT the Motion in Limine filed by Defendants Campbell and Marple (Docket No. 81) be, and it is hereby, DENIED asmoot.

IT IS SO ORDERED THIS 20th day of March, 2008.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE